UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF INDIANA
INDIANAPOLIS DIVISION

| | | |
|---|---|---|
| B.L.G., a minor, by his father Frank Goodwin, | ) | |
| Plaintiff, | ) | |
| vs. | ) | 1:11-cv-1003-SEB-DML |
| MICHAEL J. ASTRUE, Commissioner of the Social Security Administration, | ) | |
| Defendant. | ) | |

**ENTRY**

B.L.G. ("Claimant"), a minor, by his father Frank Goodwin ("Goodwin"), seeks judicial review of a final decision by the Commissioner of the Social Security Administration ("Commissioner") denying his application for Supplemental Security Income ("SSI") under the Social Security Act (the "Act"). See 42 U.S.C. §§ 402(d).

An individual under the age of eighteen is eligible for disbility benefits under the SSI program of the Act if he "has a medically determinable physical or mental impairment, which results in marked and severe functional limitations, and which can be expected to result in death or which has lasted or can be expected to last for a continuous period of not less than 12 months." 42 U.S.C. § 1382c(a)(3)(C)(i). Notwithstanding the above, no individual under the age of 18 who engages in substantial gainful activity may be considered to be disabled. To establish disability, the plaintiff is required to present

medical evidence of a physical or mental impairment that results from anatomical, physiological, or psychological abnormalities which can be shown by medically acceptable clinical and laboratory diagnostic techniques. Id. § 1382(c)(a)(3)(D). In determining whether impairments are disabling, the combined effect of all a child's impairments must be considered, without regard to whether any single impairment alone is of disabling severity. Id. § 1382c(a)(3)(G).

By regulation, the Social Security Administration ("SSA") has determined that satisfaction of one of the Listings of Impairments, 20 C.F.R. Part 404, Subpart P, Appendix 1, Part B, fulfills the statutory requirement that a child's impairment or combination of impairments "results in marked and severe functional limitations." The Listing of Impairments, Part B, is a compilation of medical conditions, divided into fourteen major body systems, that the SSA has pre-determined are disabling in children. 20 C.F.R. § 416.925. In general, each listed condition is defined by two sets of criteria: diagnostic findings that substantiate the existence of a listed condition and sets of related functional limitations that substantiate the condition's disabling severity. Id. A child's impairment or group of impairments can satisfy a listed condition in any of three ways: by meeting all the listed criteria for the condition, 20 C.F.R. § 416.925(c)(3); by medically equaling the criteria, id. § 416.925(c)(5); or by functionally equaling the criteria, id. § 416.926a(a).

A child's impairment *meets* a listed condition only when it satisfies all of the criteria of the listing. 20 C.F.R. § 416.025(c)(3) and (d). A child's impairment *medically*

*equals* a listed condition when it is at least equal in severity and duration to the criteria of a listed condition. Id. § 416.926(a). Medical equivalence will be found when: (1) the child's impairment, though listed, is lacking one or more of the medical or severity criteria, but other findings related to the impairment are of at least equal medical significance to the listed criteria, id. § 416.926(b)(1); (2) the child's impairment is not a listed condition but the impairment's medical and severity findings are of at least equal medical significance to a closely analogous listed condition, id. § 416.926(b)(2); or (3) the child has a combination of impairments, no one of which equals a listed condition, but the impairments' medical and severity findings are of at least equal medical significance to a listed condition, id. § 416.926(b)(3).

A child's impairment or combination of impairments will *functionally equal* a listed condition when it is of listing-level severity, meaning that it results in a "marked" limitation in two domains of functioning or an "extreme" limitation in one domain. 20 C.F.R. § 416.926a(a). The domains of functioning are: (1) acquiring and using information, (2) attending to and completing tasks, (3) interacting and relating with others, (4) moving about and manipulating objects, (5) caring for self, and (6) health and physical well-being, id. § 416.926a(b)(1), and SSA has defined constituent activities within each domain and their normal levels of performance at different age groups, id. § 416.926a(g)-(l). In general, a "marked" limitation exists when a child's impairment or combination of impairments "interferes seriously with [his] ability to independently initiate, sustain, or complete activities" within a particular domain. It is a limitation that

is “more than moderate” but “less than extreme,” and is the level of functioning that is expected with scores that are more than two, but less than three, standard deviations below the mean on standardized tests. Id. § 416.926a(e)(2). An “extreme” limitation is one that interferes “very seriously” with a child's ability to perform activities within a domain. It is “more than marked,” and is the level of functioning that is expected with scores at least three standard deviations below the mean on standardized testing. Id. § 416.926a(e)(3).

SSA has established a three-step sequential process for evaluating child-disability claims. 20 C.F.R. § 416.924. If disability eligibility can be determined at any step in the sequence, an application will not be reviewed further. Id. § 416.924(a). At the first step, if the child is engaged in substantial gainful activity, *i.e.*, is earning money, then he is not disabled. Id. § 417.924(b). At the second step, if the child's impairments are not severe, then he is not disabled. A severe impairment or combination of impairments is one that causes “more than minimal functional limitations.” Id. § 416.924(c). Third, the child's impairments, either singly or in combination, must satisfy the criteria of at least one of the conditions included in the Listing of Impairments. Id. § 416.924(d). If a child's impairments pass all three steps, and satisfies the duration requirement, then he is deemed disabled.

An application for benefits, together with any evidence submitted by the applicant and obtained by the agency, undergoes initial review by a disability examiner and a physician or other appropriate medical specialist. If the application is denied, the

applicant may request reconsideration review, which is conducted by different disability and medical experts. If denied again, the applicant may request a hearing before an administrative law judge ("ALJ").[1] An applicant who is dissatisfied with the decision of the ALJ may request SSA's national Appeals Council to review the decision. If the Appeals Council either declines to review or affirms the decision, then the claimant may file an action in district court for judicial review. 42 U.S.C. § 405(g). If the Appeals Council declines to review a decision, then the decision of the ALJ becomes the final decision of the Commissioner for judicial review.

The task a court faces in a case such as this is not to attempt a *de novo* determination of the plaintiff's entitlement to benefits, but to decide if the Commissioner's decision is supported by substantial evidence and otherwise is free of legal error. Kendrick v. Shalala, 998 F.2d 455, 458 (7th Cir. 1993). "Substantial evidence" has been defined as "'more than a mere scintilla. It means such relevant evidence as a reasonable mind might accept as adequate to support a conclusion.'" Richardson v. Perales, 402 U.S. 389, 401 (1971) (quoting Consolidated Edison v. NLRB, 305 U.S. 197, 229 (1938)).

In July 2004, Goodwin filed an application for SSI on behalf of Claimant, who was born on September 10, 1997, alleging a disability onset date of March 2004. After his

---

[1] Initial and reconsideration reviews in Indiana are performed by an agency of the state government—the Disability Determination Bureau, a division of the Indiana Family and Social Services Administration—under arrangement with the Social Security Administration. 20 C.F.R. Part 404, Subpart Q (§ 404.1601 et seq.). Hearings before ALJs and subsequent proceedings are conducted by personnel of the federal SSA.

application was denied initially and upon reconsideration, an ALJ found Claimant disabled from the date of his application until February 22, 2006. R. at 17. Upon Claimant's request for review, the Appeals Council remanded the case to the ALJ for further consideration of the application date as well as the time period after February 22, 2006. R. 17-18. Hearings were held on February 19, 2009 and June 25, 2009. On December 22, 2009, the ALJ issued a partially favorable decision, finding the claimant disabled from July 14, 2004 through February 22, 2006, but not thereafter. R. at 17-31.

At step one of the sequential evaluation process, the ALJ found that Claimant had been unable to engage in substantial gainful activity since July 14, 2004, the date the application for SSI was filed. At step two, the ALJ found that Claimant suffered from the severe impairments of depression, attention deficit hyperactivity disorder ("ADHD"), and post traumatic stress disorder ("PTSD"). At step three, the ALJ found that, from July 14, 2004 through February 22, 2006, Claimant had an impairment or combination of impairments that functionally equaled the listings (20 C.F.R. § 416.924(d) and 416.926(a)). However, the ALJ determined that, subsequent to February 22, 2006, Claimant did not have an impairment or combination of impairments that met, medically equaled, or functionally equaled, any of the conditions in the Listing of Impairments, and thus, was not disabled beyond that date.

The Appeals Council denied review, making the ALJ's decision the agency's final decision for purposes of judicial review. 20 C.F.R. § 416.1481. Claimant does not contest the ALJ's determination that he was not entitled to benefits before the date of his

application. Thus, the period at issue in this matter is limited to February 23, 2006 through December 22, 2009, the date of the ALJ's decision.

## Evidence

**Medical Records and School Performance.** On April 6, 2004, Claimant was evaluated by the Dunn Center mental health clinic. He was diagnosed with an Adjustment Disorder with mixed emotional features, and possible Attention Deficit Hyperactivity Disorder ("ADHD"), post traumatic stress disorder ("PTSD"), and depression. Claimant was also diagnosed with enuresis which resulted in frequent bed wetting. He was assessed with a GAF score of 45, indicating total disability. At that time he was prescribed the following medications: Strattera 40 mg for ADHD, Risperdal and Trazodone. R. at 401-419.

A few months later, on July 23, 2004, Dr. Shipley Ph.D., completed a Social Security Childhood Disability Evaluation form for Claimant. Dr. Shipley noted that Claimant suffered from several mental impairments, including: Borderline IQ, ADHD, Conduct Disorder, and depressive disorder. Dr. Shipley opined that Claimant's conduct disorder caused a Marked Limitation in the functional domain of "Interacting and Relating with Others." R. at 382-84.

Almost two years later, on April 20, 2006, a report was made to Claimant's mental health clinic that his mother was asked to bring him home from school because he had exhibited violent behavior, "throwing chairs and saying he was going to hurt someone." R. at 563. On May 1, 2006, a report from Claimant's school indicates that he had

"emotional outbursts" and was violently reacting to other students, teachers and staff members. His mother had to come to the school because of his behavior twice in the two weeks prior to this report and he had been removed from the school bus for three days because he was hanging out of the bus windows. R. at 545.

On October 3, 2006, Claimant's psychotherapist reported that he displayed anger at school and was having problems getting along with classmates. R. at 609. A few days later, on October 10, 2006, his psychotherapist noted that he had gotten into a fight at a school dance and had also taken toys from a first grade student. R. at 610. Claimant's school filed a report in December 2007, stating that his mother was called because he had refused to obey the bus driver, was making unnecessary noise, and had displayed rude, discourteous, hyper, and annoying behavior, including stating that he was skipping detention and that he thought it was funny. R. at 703.

In January 2007, Claimant's psychiatrist, Dr. Rosen D.O., reported that he was diagnosed with ADHD, enuresis, and possibly either bipolar or mood disorder. He was prescribed Adderall to treat his ADHD. R. at 675. The next day, Claimant's school reported that his behavior had gotten worse. A few months later, on April 17, 2007, the school reported that he had received a "D" in social studies and an "F" in spelling. R. at 687. However, in that same report, Claimant's teacher noted that she "loved watching him learn and grow this year" and that he had "become so much better at so many things." Id.

The next year, Claimant continued to perform poorly at school. On January 24,

2008, his school reported that he had received an "F" in reading, a "D" in social studies, and a "D" and an "F" in science. He needed to be encouraged to complete his assignments and reminded to turn in his homework. The school further reported that Claimant continued "to blurt out during class rather than raising his hand." R. at 698-99, 700, 702.

On July 3, 2008, following an examination of Claimant, Dr. Sowinski, M.D., from St. Vincent's Physician Network, diagnosed him with ADHD, listing twenty-three symptoms of the disorder he exhibited and noting that Claimant experienced twelve of these symptoms either "often" or "very often." Claimant was being treated with Adderall XR, Risperdal, and Clonidine. At that time, Claimant was attending special education classes full-time.

On October 10, 2008, Claimant's psychotherapist reported that he continued to have behavior problems, including lying and manipulating events between his mother and grandmother. He was prescribed Risperdal, Vyvanse, and Catapres. R. at 781. On November 18, 2008, Claimant's psychotherapist reported that Claimant was experiencing negative side effects from the ADHD medication Adderall. Claimant stated that the medication made him feel "loopy" and angry. R. at 812. Almost one month later, on December 9, 2008, his psychotherapist noted that Claimant was "making some progress toward treatment goals, but still requires assistance." R. at 822. Around that same time, his school reported that he did not pass the English/Language Arts portion of the Fall 2008 ISTEP testing. R. at 856.

On December 10, 2008, Claimant was evaluated by a school psychologist. At the time of the evaluation, Claimant was in fourth grade, in special education programming under the designation of "Other Health Impairment." The report indicated that he had repeated kindergarten and had been diagnosed with Adjustment Disorder with Mixed Emotions/Conduct and ADHD-Combined Type. The report also noted that his third grade records stated that he had problems with "attitude and inappropriate behavior." R. at 858. The report further noted that, in January 2008, he was evaluated and placed in special education programming. Accommodations for his learning problems included shortened spelling lists and assignments. He was paired with a student who would be a good model for "attention." R. at 863. The school psychologist reported that Claimant's prior records indicated he worked best when he received one-on-one instruction, that he was easily distracted and impulsive with a tendency to interrupt others or talk during inappropriate times and that his performance was directly impacted by his ability to focus and concentrate. Id. The evaluation stated that Claimant had previously been diagnosed with Bipolar Disorder, not otherwise specified, PTSD, ADHD, and that he had been a past victim of physical and sexual abuse. It was also noted that Claimant had been treated for oppositional defiant disorder and adjustment disorder with mixed emotions/conduct, in addition to antisocial behavior. R. at 864. The school psychologist reported that, during the December 2008 observation, Claimant "did not present with inattention; he was actively involved with the assignment" and that the observation "did not indicate any serious problematic behaviors." R. at 859.

On January 1, 2009, Claimant's Case Conference Committee reported that he was receiving passing grades with accommodations, but he was performing below grade level in reading (third grade level) and had not passed either section of the fall ISTEP. R. at 868. On February 9, 2009, Claimant's psychotherapist opined that Claimant had marked impairment in the functional domain of "Attending and Completing Tasks." R. at 849. A few days later, on February 11, 2009, Dr. Lebo, Ph.D., Claimant's treating psychologist diagnosed him with Attention Deficit Disorder and Sexual Abuse of Child. Dr. Lebo opined that Claimant had a prognosis of "Fair." R. at 850. On February 17, 2009, Claimant was prescribed the following medications: Risperdal, Catapres, and Focalin XR. R. at 876. Claimant's psychotherapist reported on April 9, 2009, that Claimant was having problems with lying and manipulative behaviors. R. at 880. At that time, Claimant reported to staff that he continued to have flashbacks and nightmares regarding the past sexual abuse he had experienced.

**Hearing Testimony.** At the February 19, 2009 hearing, both Claimant and Goodwin testified. R. at 944-63. Claimant was eleven years old and in the fourth grade at that time. R. at 944. Claimant testified that he had been held back one year and that he was in special education classes. According to Claimant, he got along well with some kids at school, but not others, and that, perhaps once a year, he got into fights at school. Claimant further testified that he had problems getting his homework turned in on time and paying attention to what was going on in class but that he no longer received "F's" and instead was awarded grades of A's, B's, and C's. R. at 944-46.

At that same hearing, Goodwin, Claimant's father, testified that being placed in special education classes had helped Claimant show improvement academically and that he took medications that were helpful for his ADHD, trouble sleeping, and depression. R. at 952-53, 960-61. However, Goodwin testified that his son's mental health problems were largely the same as they were in 2003. Claimant still wet the bed when he had a bad day at school or had gotten into trouble at home. R. at 956. Without his medication, he had problems with depression. R. at 953. Goodwin stated that some days Claimant picked fights with his siblings, but got along well with them on other days. R. at 954-55. Goodwin testified that Claimant had been diagnosed with PTSD resulting from sexual abuse perpetrated by his older brother and sister, and, as a result, he was scared to have physical contact with people other than his stepmother and father. R. at 954.

At the June 25, 2009 hearing, Claimant testified that he was in the fifth grade and that he saw a psychotherapist every week at school. He testified that he was "doing really good" and taking his medication as prescribed. R. at 908-09.

Goodwin also testified at the June 25, 2009 hearing. Goodwin testified that, approximately three weeks earlier, Claimant had informed him of recent sexual abuse by his older brother. According to Goodwin's testimony, before the abuse came to light, Claimant had been getting along better with his siblings and had been doing well in school, but since he had been abused, Claimant had become more violent toward his other siblings as well as other children and animals, including hitting and kicking animals. R. at 911-12, 914-16. At the time of the hearing, Goodwin had not yet been able to make an

appointment with Claimant's therapist to discuss the most recent abuse, but Claimant's psychotherapist was trying to get him into a therapy group for abused children. R. at 915-16. Goodwin reported that, when required to concentrate in school, his son would get up from his seat, wander around and be very impatient and that it was a struggle to get him to pay attention and stay on task. R. at 916-17.

## Discussion

**Step 3 determination.** Claimant argues that substantial evidence fails to support the ALJ's decision at step three that Claimant's ADHD disorder did not functionally meet or equal Listing 112.11 (ADHD) after February 22, 2006. The criteria for Listing 112.11 (as applied to this case) require medically documented findings of marked inattention, marked impulsiveness, and marked hyperactivity, as well as two of the following findings: marked impairment in age-appropriate cognitive or communicative, social or personal functioning or in maintaining concentration, persistence and pace. 20 C.F.R. Part 404, Subpart P, App. 1, §§ 112.02(B)(2); 112.11. As discussed above, in order to be functionally equivalent to a Listing, a child's impairment or combination of impairments must cause "marked" limitations in two broad areas of functioning or an "extreme" limitation in one area of functioning. 10 C.F.R. §416.926a(a). The six broad areas of functioning, or "domains," used to determine functional equivalence include: (1) acquiring and using information; (2) attending and completing tasks; (3) interacting and relating to others; (4) moving about and manipulating objects; (5) caring for yourself; and (6) health and physical well-being. 20 C.F.R. § 416.926a(b)(1).

In his decision, the ALJ determined that, until February 22, 2006, Claimant's ADHD caused a marked limitation in two domains – interacting and relating to others and caring for personal needs – and thus, was functionally equivalent to Listing 112.11. As of February 22, 2006, forward, however, the ALJ found that Claimant's impairments improved and that he no longer exhibited a marked limitation in any of the six broad areas of functioning. Claimant argues that the ALJ ignored or rejected evidence in the record that establishes that Claimant's ADHD was functionally equivalent to Listing 112.11 after February 22, 2006. Specifically, Claimant points to the following records: (1) the April 6, 2004 Dunn Center mental health evaluation in which he was given a GAF assessment of 45, which, by DSM definition indicated he was totally disabled; (2) the July 23, 2004 Social Security childhood disability evaluation form completed by Dr. Shipley, in which Shipley opined that Claimant had a marked limitation in the interacting and relating with others functional domain; and (3) the February 9, 2009 Dunn Center mental health evaluation which reported that Claimant had a marked impairment in the attending and completing tasks domain. Claimant argues that, taken together, these three pieces of evidence establish functional equivalence to Listing 112.11 after February 22, 2006.

Claimant's argument is without merit. Two of the records he identifies are dated April and July 2004. But the ALJ found Claimant disabled from the date of his application, July 14, 2004, through February 22, 2006. Thus, the fact that the evidence shows that Claimant had marked limitations before and during the period that the ALJ found him disabled does not establish that Claimant remained disabled after February 22,

2006, almost two years later. It is true that the February 9, 2009 evaluation conducted by the Dunn Center that Claimant cites is more relevant to the time period at issue. However, even if the ALJ had wholly adopted that piece of evidence as Claimant urges he should have, it would still be insufficient to establish functional equivalence as the evaluation found only one marked limitation, in attending and completing tasks, which falls short of the two marked limitations required to functionally equal Listing 112.11.

In short, substantial evidence supports the ALJ's conclusion that Claimant showed improvement after February 22, 2006. In support of his determination, the ALJ cited records from Claimant's physician, Dr. Rosen, noting that, although Claimant struggled when not on medication, he was stable when medicated and that his behavior, mood, and cognition were age-appropriate as well as therapy notes stating that his behavior both at school and at home had showed improvement. R. at 22-24, 28. The ALJ reasonably relied on these records to conclude that Claimant no longer had marked limitations sufficient to meet or equal the Listings after February 22, 2006. Although it is true, as Claimant argues in his reply brief, that the ALJ did not mention certain medical records in making his step three determination, it is well-established under Seventh Circuit law that "the ALJ need not provide a written evaluation of every piece of evidence." Rice v. Barnhart, 384 F.3d 363, 371 (7th Cir. 2004) (citing Diaz v. Chater, 55 F.3d 300, 308 (7th Cir. 1995)). The ALJ adequately explained his reasons for concluding that Claimant's impairments did not meet, medically equal or functionally equal Listing 112.11 and has supplied the requisite "logical bridge" from the evidence to his conclusion. Terry v.

Astrue, 580 F.3d 471, 475 (7th Cir. 2009) (citation omitted). For the foregoing reasons, we find that substantial evidence supports the ALJ's step three determination.

**Credibility.** Claimant also argues that the ALJ's credibility determination was in error. The ALJ stated as follows:

> After considering the evidence of record, from July 14, 2004, through February 23, 2006, but not thereafter, the undersigned finds that the claimant's medically determinable impairment(s) could reasonably be expected to produce the alleged symptoms, and that the statements concerning the intensity, persistence and limiting effects of these symptoms are generally credible.

R. at 30.

We are required to afford the ALJ's credibility determination "considerable deference," generally only overturning it if it is "patently wrong." Prochaska v. Barnhart, 454 F.3d 731, 738 (7th Cir. 2006) (quotations omitted). Here, the testimony of Claimant and his father, Frank Goodwin, support the ALJ's determination that Claimant was not disabled after February 22, 2006. Mr. Goodwin testified that, with the exception of the three weeks prior to the June 2009 hearing, Claimant had shown improvement, both academically and in his ability to get along with his siblings. R. at 912-16, 952, 955. Mr. Goodwin further testified that Claimant's medications helped with his ADHD, difficulty sleeping, and depression. R. at 953, 960-61. Claimant testified at the hearings that he was doing well in school and had been taking his medications. R. at 909, 944-46. Accordingly, even accepting all of the testimony of Claimant and his father as credible, that testimony still supports the ALJ's finding of no disability after February 22, 2006.

Thus, although the ALJ could have explained in more detail the manner in which the testimony of Claimant and his father supported his ultimate decision, any such failure is harmless in these circumstances.

## Conclusion

For the reasons detailed herein, we find that the final decision of the Commissioner is supported by substantial evidence and free of legal error, and thus, is AFFIRMED. Judgment consistent with this Entry shall be issued accordingly.

IT IS SO ORDERED.

Date: 08/24/2012

SARAH EVANS BARKER, JUDGE
United States District Court
Southern District of Indiana

Copies to:

Thomas E. Kieper
UNITED STATES ATTORNEY'S OFFICE
tom.kieper@usdoj.gov

Patrick Harold Mulvany
patrick@mulvanylaw.com

SSA (Court Use Only)
SOCIAL SECURITY ADMINISTRATION (SSA) added for email notification purposes to the SSA General Counsel, pursuant to A.O. memorandum of 7/19/2007.
.NULL.